## 9269

### SHERWOOD *ET AL.*, EXORS., v. McLAURIN *ET AL.*

#### (88 S. E. 363.)

1. EXECUTORS AND ADMINISTRATORS—POWER OF SALE.—Where testator's will directed that his debts be paid, and then devised to his children, naming them, all the proceeds arising from the sale of his house and lot in the town of Clio, to be equally divided after all just debts were paid, the executors were given, by necessary implication, power to sell the land, more particularly where there was no other way in which to pay the debts.

2. EXECUTORS AND ADMINISTRATORS—SALE OF REALTY—POWER TO BID IN.—Executors, who advertised a sale of testator's realty, which they had power to sell, in their discretion could bid the place up to the price they were willing to take for it and bid it in themselves, acting in their representative capacity for the estate, and not personally.

3. WORK AND LABOR—SERVICE RENDERED BY CHILD—PRESUMPTION.—Services rendered a parent by children are presumed to have been rendered from affection, and not from any expectation of being paid.

4. WORK AND LABOR—PARENT'S LIABILITY FOR SERVICES—NECESSITY FOR CONTRACT.—A daughter suing her father's estate for compensation for services cannot recover, unless there was an express agreement providing for specific or reasonable compensation and the father not only intended to pay her something, but legally obligated himself to do so.

5. WILLS—ELECTION OF LEGATEE.—Where testator's will gave to his daughter, who had rendered him services in his lifetime, and her two sons, all of his effects, including household and kitchen furniture, "this to be a balance in lieu for all services rendered to me by her since she has been with me, this to be equally divided between them," and the daughter, after admitting the validity of the gift to her and

her sons, thus taking the property, filed a claim against the estate for services rendered from the date of the will to the date of testator's death, she could not recover, having elected to take the property in full of all claims, while a will speaks from testator's death.

6. WORK AND LABOR—SERVICES BY CHILD—AGREEMENT TO PAY—SUFFICIENCY OF EVIDENCE.—In a daughter's suit against her father's estate for services rendered him in his lifetime, evidence *held* insufficient to show that the father had agreed to pay the daughter anything.

7. WILLS—ELECTION—ACCEPTANCE OF NOTE.—Where a father, to whom his daughter rendered services, executed a note, payable by his estate, which he left her by will, the daughter, having accepted the note and proved it as a claim for her services, could not claim more therefor, and that the instrument was evidence of an agreement to pay for the services.

8. WILLS—FORFEITURE OF LEGACY.—Where a will gave personalty to testator's daughter and her sons in full "in lieu for all services" rendered while she was living with him, and provided that if any of his children attempted to have his will set aside or changed they should forfeit all right in his estate, but without making any gift over of the subject-matter of the legacy to the daughter, such daughter, by taking the property under the will and seeking to get in addition compensation for her services by proving an account therefor, did not forfeit her interest in the estate, since in case of a legacy breach of such a condition will not work a forfeiture, unless there is a gift over of the subject-matter of the legacy, and where there is no such gift and a *probabilis causa litagendi*, a breach of the condition will not work a forfeiture either as regards a legacy or devise.

9. USE AND OCCUPATION—DAMAGES. — Where a daughter, after her father's death, remained in possession of his house, to which she made no claim of title, after his executors had demanded possession and she had refused to give it up, she was liable to them for the fair rental value of the property.

10. EXECUTORS AND ADMINISTRATORS—RIGHT TO COMMISSION.—STATUTE.—Under Civ. Code 1912, sec. 3648, providing that if an executor neglects to render annual accounts he shall not be entitled to commissions, an executor is entitled to commissions, unless shown to have failed to make regular annual returns, being entitled to no commissions in the years in which he failed.

11. EXECUTORS AND ADMINISTRATORS — AUTHORITY TO PROCURE MONUMENT.—It is within the authority of executors to procure a monument for testator's grave.


Before BOWMAN, J., Bennettsville, August, 1915.  Affirmed.

Action by T. C. Sherwood and J. C. Cottingham, as executors of the last will and testament of James S. LeGette, deceased, against E. A. McLaurin, Mary J. Cottingham, Neill A. LeGette, Laura T. Sherwood, Julia Markey, Lina McLaurin, Laura Markley, Francis B. Markley, Sallie Calhoun Stubbs, John C. Calhoun, W. H. Calhoun, as heirs at law, legatees and devisees of said deceased, and E. Sternberger Company, a corporation and creditor.

This is the second appeal. The former being reported in 96 S. C. 348, 80 S. E. 609. The facts are stated in the referee's report as follows:

Jas. S. LeGette was a prominent citizen of Marlboro county, and died in November, 1909, leaving his last will and testament, which was duly probated, and a copy of which is reported up with the testimony herein.

The plaintiffs herein qualified as executors, and proceeded with the administration of the estate, which consisted of a small amount of personal property, and a house and lot in Clio, S. C., where the testator resided before his death. He was survived several months by his wife.

Some time after their qualification, the executors, acting under what they considered authority given them in the will, advertised the house and lot for sale in Bennettsville. At the sale one of the defendants, Mrs. Julia Markey, a daughter of the testator and the only defendant in this case who has made a contest, through her attorney, J. K. Owens, made proclamation that the executors had no authority to sell and could convey no title. The executors had previously instructed their attorney, D. D. McColl, to bid the place up to $7,000, as they considered it should bring that. There were bids, and the place was knocked down to McColl as attorney for the executors. Thereupon the executors brought this suit against all the parties, heirs at law, legatees and devisees, including one creditor, to construe the will

and establish the power of the executors, etc.   No answer
was made to the complaint except by Mrs. Julia Markey.

Mrs. Markey was in possession of the house at the death
of her father and mother, and has resided so ever since,
having exclusive possession thereof, and previous to the
sale had filed with the executors an account in which was
included a bill for nursing her father and mother.   In her
answer she admitted the death of· Capt. LeGette, leaving
unrevoked and of full force, his last will and testament
already probated, and set up the sale of the house and lot,
after due advertisement, and the purchase of it by the execu-
tors, and that they had been in possession of the money ever
since, and had refused and failed to make settlement with
the creditors and legatees, especially setting up her own
claims filed with them, and asking for judgment. for the
amount thereof.

The case went to the Supreme Court on the scope of the
pleadings, and they held in 96 S. C. 348, 80 S. E. 609, that
it was a creditor's bill, to call in creditors, sell the land, pay
debts, and divide the remainder, and that Mrs. Markey had
properly set up her claim in the action.   No order requir-
ing creditors to come in and prove their claims has, so far
as I know, ever been passed by the Court, and there has
been no reference on claims as such, but the executors have
exhibited various claims filed with them, and amounts paid
by them for the estate, which will be hereafter set forth.
I presume that this substantially carries out the require-
ments.

The contest in the case has been ·between the executors
on the one side, and Mrs. Julia Markey on the other, none
of the other parties having made answer, and the main
question over which the contest has arisen is whether Mrs.
Markey has the right to compensation in the sum of $720.00
for services, board, washing, nursing and care during the
last illness of Jas. S. LeGette, from December 18, 1908, to
October 8, 1909, at $75 per month, and for the same items

as to Mrs. Jas. S. LeGette, her mother, from December 24, 1908, to December 3, 1909, at $100 per month, $1,130.

The testimony has taken a very wide range, and has covered many disagreeable incidents, shows contradictions between the witnesses, and is largely on the question of the good or ill treatment of Capt. and Mrs. LeGette by Mrs. Markey, their daughter. It was agreed among counsel that all the testimony should be taken down, and that such objections as either party desired to make to it should be made at the argument. At the argument no special objections were made at all, and each side merely said they objected to any testimony that was objectionable under section 438 of the Code of Civ. Proc., if it had not been waived. This objection is so general, and both the executors and Mrs. Markey having introduced evidence conflicting with that rule, I think the protection of the statute has been waived. At all events, I have considered all of the testimony, and make this statement in order that if there is error in this the parties wronged may be in a position to except.

Possibly the first question that should be adverted to is whether the executors had a right to sell the property. There is no express authority given in the will to make sale, but he directed, first, that his debts be paid, and second, he devised unto his children (naming them), "All the proceeds arising from the sale of my houses and lot in the town of Clio, this to be equally divided between the above-named children, after all just debts are paid." I think that by necessary implications this gave the executors power to sell the land, especially when it is admitted by all parties that there was no other way in which to pay his debts, and the executors could not well divide the proceeds among the children until they had disposed of the property. *Clark* v. *Clark,* 46 S. C. 244, 24 S. E. 202, and other cases. The testimony is clear to the effect that they bid as officials according to their judgment, for the protection of the estate,

and not personally. (See the testimony of Milton McLaurin and that of T. C. Sherwood.)

Now the question is, therefore, whether executors, having advertised a sale, have power in their discretion to bid the place up to the price they are willing to take for it. It would seem to me it was clear that they would have the right to withdraw the property from the sale, there being no order of Court requiring it to be sold at a particular time, and if they could withdraw it from sale, could they not do what is in effect the same thing—merely bid a higher price for the estate? The advantage is a practical one; for by bidding they might be able to procure the sale at an advantageous price, while a mere withdrawing of the property would prevent any possibility of disposing of it. There is absolutely no testimony that they bought it in personally. It is not a case where a party, who was also administrator and executor, bought it in for himself. In those cases anyone interested can raise the question of the legality of the sale, and can have it set aside if it is not fair, or can ratify it and hold the purchaser responsible. Here the testimony is that it was bid in by the executors in their official capacity, was knocked down to them by the auctioneer; no deeds were ever made, and they have always contended that they were acting in their official capacity. No one has objected to this except Mrs. Markey, and I do not think it lies in her mouth to object to the executors having taken this step, when she had a proclamation made at the sale that whoever bought it would take an insecure title. It would seem to me that it would have been the duty of the executors, when the property did not bring what they had regarded it to be worth, either to withdraw the sale, or to have it bid in for the estate. However, if I am wrong as to the will giving power to the executors to sell the land, then the attempted sale by them would be void, and the result would be the same.

Now as to the question of the compensation of Mrs. Markey. A great deal of the testimony is dependent for its relevancy upon the initial determination whether there is a contract either express or implied in the case. Both parties have cited the case of *Ex parte Aycock,* 34 S. C. 255, 13 S. E. 450, as giving the law which prevails as to services, furnishing of board, etc., between parents and children and such intimate relatives. Whatever may be its foundation, I think it beyond a doubt that it is the rule that services between such intimate relatives as parent and children are presumed to have been rendered from affection, and not from any expectation of being paid for them, and a mere quotation of the cases cited will sufficiently show it.

*Ex parte Aycock,* 34 S. C. 257-258, 13 S. E. 450: "It seems to us that the true rule upon the subject is that where a child renders service to his parents, the presumption is that such service was rendered in obedience to the promptings of natural affection, and not with a view to compensation; but that such presumption may be rebutted by positive and direct evidence that such is not the fact; and that mere loose declarations on the part of the parent that the child ought to be paid for his services, or that he intended or wished him to be paid, will not be sufficient to rebut the presumption. It must appear either that there was an express agreement between the parties providing for specific or reasonable compensation, or that the circumstances should show clearly that the parent had not only intended to pay something, but had assumed a legal obligation to do so."

The rule in this case was ratified as late as 1903 in *Wessinger* v. *Roberts,* 67 S. C. 243-244, 45 S. E. 169, where the statement is made as follows: "Services of the nature described by the witnesses, rendered by a daughter to a suffering mother, though very onerous, exhausting and unpleasant, are presumed to be given and received as expres-

sions of self-sacrificing devotion. It is true, there was evidence to the effect that much of the service was rendered while the mother and daughter were not members of the same household; and there is high authority for the proposition that the presumption of gratuitous service prompted by affection alone does not exist in such case. 21 Am. and Eng. Ency. of Law, 1063. We do not, however, assent to this view. The presumption that no charge is intended for nursing and care bestowed by those closely connected in family life is based on the conception that such services ought to be, and usually are, freely given under the promptings of affection, which is not dependent on the circumstances of living in the same household. We think the better view is, while this fact tends to weaken the presumption, it will not of itself destroy it, and warrant the legal inference of implied contract to pay for such services, or even require the case to be sent to the jury; but where there is evidence of other circumstances tending to establish an implied contract, the fact that the mother and daughter were living in different homes might well be regarded as giving color and support to such evidence.

"We are asked to hold that the presumption of gratuitous service does not extend to menial labor not usually performed by one member of a family for another. It is true, the nature of the service is an important factor in determining whether it is to be regarded gratuitous, but we see nothing in the testimony relating to the character of the plaintiff's services to warrant the inference that compensation was contemplated. * * * An implied contract can only be proved by showing the circumstances, and what the parties said and did in respect to their relations to each other. As was held in *Ex parte Aycock,* 34 S. C. 257, 13 S. E. 450, 'the circumstances must show clearly that the parent not only intended to pay something, but had assumed a legal obligation to do so.' This intention and legal obligation need not be proved by an express promise, but may be gath-

ered from all that the parent said and did relating to the services. From such testimony the contract may be implied."

The circumstances disclosed by the testimony are that Capt. and Mrs. LeGette had seven daughters, all of whom married. The youngest, Mrs. Markey, moved first to Richmond, and then to Charlotte, where her husband died, leaving her without means. On her father's invitation she came back home with her two infant children, about 1888, and resided there with them continuously from that time until their death, and until now, and her children were raised in the household of their grandfather. . It seems to be true that at that time Capt. LeGette was in fair circumstances, owning his home and a small plantation and 15—18 lots in town besides—pages 36 and 83. Gradually, however, in the course of time all of the property was consumed, that one devised in the will to Francis Markley having been given to him before the testator's death; that during this time Capt. LeGette until a short time before his death was in good health, but Mrs. LeGette suffered a fall about two years from the return of Mrs. Markey and was thereafter confined to a rolling chair and in late years was afflicted with a cancer and blindness, and became quite a charge. That they ran a boarding house, Mrs. Markey doing her part of the work and deriving a support for herself and her children, just as members of the family; that Capt. LeGette was head of the family until several years before his death, when he turned over the more direct management of the house to Mrs. Markey. Just here it might be well to notice that the claim filed for attention to Mrs. LeGette covers a period after the death of Capt. LeGette, and it would appear that so far as services rendered during that period is concerned, that the claim would not be against the estate of Capt. LeGette. In order for Mrs. Markey to sustain a claim for services as rendered under the ruling of the cases above it must be shown that there was an express

agreement providing for specific or reasonable compensation, and that the parent had not only intended to pay her something, but he had assumed a legal obligation to do so.

Now the evidence, as I gather it from the testimony to show the existence of a contract between Mrs. Markey and Capt. LeGette to pay her are: Mrs. Markey testified, on page 6: "Q. State what, if anything, your father could do when you would become weak and in bad health that way? A. He would always tell me not to give up; that we would have to mortgage the house, we would have to do away with the boarders; he told me to just run the business on as well as I could, that it would all be mine in the end; that it was to my interest to keep the boarders, and for me to keep of good heart, that it would all be mine." She further testified that her father had made a will prior to the one probated, and that at the testator's death the house and lot in Clio were to go, page 7, "To my mother and at her death to me, and at my death to my children," and also on page 8, in answer to the question: "State whether or not it was with that understanding that you stayed there and worked and labored as you did? A. Yes, sir, he said it would all be mine in the end." On page 15, in answer to the question: "The only statement that your father ever made to you was the fact that he had made a will in your favor? A. Yes, sir, he said that it would all be mine, and for me not to worry about it, to go on and do the very best I could, that I would be provided for." Dr. Evans, on page 57, in answer to the direction to give in substance what Squire LeGette said, testified: "The words in effect would be that they were in a very poor condition, and that his daughter, Julia, was his mainstay, and that he felt sorry for her and wanted to do something for her. He would say, 'You are having a hard time, but that you will be rewarded for it some time.' I can't remember the exact words he used. The only thing I can say about that is the impression he left on me at the time." Question: "State whether or not

he stated to you, in so many words or in effect, that Mrs. Markey would receive, and would be entitled to receive, compensation and pay for all the trouble and worry and nursing and attention that she gave him?" Answer: "Yes, sir, he stated that repeatedly, more than one time." Question: "Did he ever state that to you in the presence of Mrs. Markey, if you remember?" Answer: "I don't remember; I think sometime she would be in the room present, but I cannot say for a fact, but I rather think she was present sometime. He made this impression on me, that he was sorry he was not able to do something for her; said that she had been so good to nurse him." Question: "Was that the effect of his words to you?" Answer: "Yes, sir." Question: "The effect of his words was that he was sorry he was not able to pay her for her services at that time?" Answer: "That was the impression he made on me." On cross-examination, on the same page 58, he said: "He stated this to me, that he regretted that he did not have much, but what little he did have he expected to give it to her. I can't remember his exact words, but he did state to me that he did not have much, but that what little he had he expected to leave it to his daughter for her goodness and her services." And on page 59, he said, on cross-examination, that the last time he had any conversation, was as follows: Question: "Did he say anything to you then about Mrs. Markey getting his property?" Answer: "In a general way; he talked like when he was dead and gone that maybe she would get something; that he could not pay her then." Question: "He never did say, then, that she would get it all?" Answer: "I cannot say." Question: "He never impressed you with the fact that he intended to leave it all to her?" Answer: "No, really it never made very much impression on me. He said that some day Mrs. Markey would be rewarded. I have heard him talk that way, and have seen the tears in his eyes." And later, on same page: Question: "And he had before that time several times talked to you in

regard to it?" Answer: "Yes, sir, he has said to me he did not have much, but what little he did have he was going to give to Julia; that his other children were well to do and did not need it, and that she did."

As opposed, more or less to the idea that there was a contract between the parties that Mrs. Markey was to be paid, is the statement on the part of the other children of facts and feelings inconsistent with the existence of such a contract. The declarations of the father testified to by the other children, is testimony of similar character and value as declarations of the testator testified to by Mrs. Markey, and both subject to the same objection. There is also some testimony to the effect that there was a contract that Mrs. Markey was to run the house and board and look after Mr. and Mrs. LeGette in return for the use of the house; and Mrs. Cottingham, on page 75, said that "Mrs. Markey said my father turned over the house and boarders to her in January of the last year, and she was to take care of my father and mother, and there was to be no charge for their board. My father told me this, too. She was in the active charge of the house that year. She did not tell me about the board." Mrs. Markey herself said, on page 89, that Capt. LeGette's memory became bad about three years before he died, and that he turned over to her the house, and that the income about equaled expenses. "We did not lose money on it." Mrs. E. A. McLaurin, page 86, testified that Mrs. Markey was always worrying her father to make a will in her favor; and on pages 13 and 14 Mrs. Markey said: Question: "Mrs. Markey, I want to understand what you are contending for. Are you contending in this case that the property down there belongs to you, or that you ought to be paid these amounts?" Answer: "It would have belonged to me if I had gotten what I think I deserved, but as I did not, I think I ought to have been paid for my services there." And on page 14: Question: "What was the reason you did not leave your father and go and live there?"

(To wit, with her husband's people.)    Answer: "Well, after my mother suffered that fall, I felt I ought to stay there and take care of her; I did not have the heart to go away and leave her in that condition."

We have in addition the fact that Capt. LeGette made a will in due form, and which is not contested, but under which Mrs. Markey takes property, and under which she claims wherein he disposed of his entire property, giving among other things, to her and to her two children, Laura and Francis B. Markley, "all of my personal effects, including all household and kitchen furniture, this to be a balance in lieu for all services rendered to me by her since she has been with me, this to be equally divided between them."    Mrs. Markley admitted the validity of this clause, as I understand.    She has taken the property, but she filed a claim against the estate for the time after the date of the will.    It is my understanding that whatever may be the date of the will it goes into effect at the death of the testator, and for most purposes it is an efficacious instrument only from that date.    For certain purposes the date of the will is to be considered, but for the purpose of conveying property it is the date of the death of the testator that the transfer takes place, and takes place subject to the conditions annexed.    By the testimony, therefore, it would seem to me that Mrs. Markley, having elected to take the personal property, necessarily elects to take it in full of all claims for services.    *Garrett* v. *Garrett,* 21 S. C. Eq. (2 Strob. Eq.) 283; *Wellborn* v. *Townsend,* 31 S. C. 42, 10 S. E. 96.

I do not think there is sufficient testimony to sustain the position that Capt. LeGette had assumed a legal obligation to pay anything for the services rendered in the foregoing, disregarding for the time the express condition of the gift in the will; but that it was his intention to give Mrs. Markley something is clear by the fact he made a provision in the will for her over and above others, and by the further fact that he gave her the note for $500, Exhibit

"K-2." This instrument has not been seriously assailed. It is of an unusual form, and might be attacked as a testamentary paper, but I think it is good, and that Mrs. Markley is entitled to have it carried out.

It is also contended that it is evidence of an agreement to pay for services, and that the agreement being so established, it only remains to ascertain what they were worth. But if this instrument is evidence of an agreement, then it is evidence of the agreement it sets forth, to wit, that is to pay $500, and we can not go further than the instrument itself. Clearly his intention was to pay the $500 and nothing more. Mrs. Markley having accepted this note, proved as a claim, must take it according to its terms. It is dated December 24th, 1908, six days subsequent to the date of the will, and to be paid by his executors, and in his will Capt. LeGette leaves to Mrs. Markley along with her children, besides the share of the proceeds of the home lot, all his personal property. The testimony is that Capt. LeGette was familiar with the law, being a magistrate and legal adviser for the Clio vicinity for many years, and the most reasonable inference to be drawn from these facts is, it seems to me, that he meant the $500 and the property bestowed in his will upon Mrs. Markey and her children, to her full reward, particularly when he coupled to the bequest an express condition that it is to be taken in lieu of all services. The words are as follows: "I give, devise and bequeath to Julia Markey, and her two sons, Laura and Francis B. Markey, all of my personal effects, including all my household and kitchen furniture, this to be a balance in lieu for all services rendered to me by her since she has been with me, this to be equally divided between them."

If Capt. LeGette had made a contract for services, I do not think he could void it by a provision in his will, but if he made a provision, and the property given on the condition was taken, I do not see how the donee can then refuse to abide by the condition. She would be estopped, for no

one who takes under a will can assail it. The answer given to this, as I understand it, however, is that the claim for services goes back only to the date of the will, and that the will did not contemplate the covering of anything subsequent to its date (and, of course, in the case of the note subsequent to the date of the note).

I have noticed above the time from which a will speaks, but there is this additional to be said about this particular feature. The will certainly did not transfer the property until after the death of the testator, and when it passed it was with the condition attached; therefore, an acceptance of the property necessarily took place at the death of the testator, and the acceptance carried with it the observance of the condition. I do not think there is sufficient evidence outside of the will and note to overcome the presumption under the authorities of the cases cited, nor do I think that the note and will are evidence of anything beyond what they contain themselves.

Holding this, it will not be necessary to go into the question of the value of the services rendered; the good or ill treatment of Capt. and Mrs. LeGette by Mrs. Markey; the charges and countercharges of delinquencies, and failure in attention and care on the part of the other children. There is nothing in the rule, as I understand it, which discharges one because another equally bound, failed in his duty, nor requires any fine adjustment between them of the duty which children owe to a parent. In which cases the law also presumes that "He loveth most who serveth most."

The next question is really a difficult one. By the fourth section of the will, the testator states, "And I will that if any of my children, after my death, attempts to have my will set aside, or changed in any way, they shall forfeit all right or interest in my estate." The validity of provisions of this sort are usually upheld and are permitted in this State; and the question is whether or not Mrs. Markey is in conflict with it. The testator required that his

just debts be paid, and in view of the particular provision, if Mrs. Markey's services had been contracted for, she would have a right under the will to be paid for them, but by the preceding clause he gave to her property in lieu of all services, and she took the property. So is the proving of an account and the seeking to get further compensation an attempt to change the will in any way? If the will speaks from its date only, of course, it does not. But I have held otherwise.

The question of the effect of provisions of this sort is noticed in a recent case in this State. *Rouse* v. *Branch,* 91 S. C. 112, 74 S. E. 133, 39 L. R. A. (N. S.) 1160, 30 A. & E. Ann. Cas. 1913e, 1296, and that case seems to hold as the general law: "That in case of a legacy a breach of the condition will not work a forfeiture unless there is a gift over of the subject matter of the legacy. If there was no gift over, and there was *probabilis causa litagendi,* a breach of the condition will not work a forfeiture, either as regards a legacy or devise."

There is no gift over *eo nomine* in this instance, and I, therefore, hold under the authority of that case, that she will not forfeit her interest in the estate. As the will has been construed she took a legacy, the devise being of her part of the proceeds of the land,—an equitable conversion having taken place.

This brings us to the question of what shall be done concerning the accounting as to rents for the house occupied by Mrs. Markey. The question was discussed at the hearing as one of an accounting for rent. Mrs. Markey, in her answer, sets up that the property was sold after due advertisement, and she stated in her testimony, on page 13, that she does not claim that the property belonged to her; and on page 17 that she agreed to vacate it when the executors paid up her claim. So there is no claim on her part of any title.

25—103

The case does not seem to be one of an accounting between tenants in common; she was in the execlusive possession, but rather as an outsider; and with the above admission on the part of Mrs. Markey, and that possession had been demanded of her and she refused to give up, it appears that the rental value of the property which she has held the executors out of would be the proper measure, rather than what she made out of it herself.    It is town property, and has been in her exclusive occupation since the date of the death of the testator.

The testimony upon what the house is worth is very meager, and to fix a valuation on it under the circumstances is really only a guess.    Other features of the case were stressed most.    Mr. Sherwood testified that the house was worth $25.00 a month, page 77; and that Mrs. Markey said that it was worth $25.00 a month, page 13; while on page 102 he said that she said it was not worth more than $20.00 a month.    Mrs. Markey said that Mr. Sherwood told her that he had been offered $25.00, and she told him that $20.00 would be a plenty, and that she did not think the executors could get as much as that, page 88.    Mr. N. T. Hargrove, page 91, said that he lived within 300 yards of Capt. LeGette; that he was there frequently; that the house in good repair was worth from $12.00 to $20.00 a month; that he thought in its present condition it could not be rented.

Such is the testimony as to rental value.    As to rents actually received, Mrs. Markey states that she has rented a room at $2.00 a month, and that is all the rent she has derived from it.    Inasmuch as she does not claim she has any title to it, I do not see that there can be any doubt that she would be liable for a fair rental value of the place to the executors whose right to the house under the will is not disputed, but to whom on their demand, possession was refused.    It is impossible, with any degree of accuracy from the above testimony, to state what would be a fair rental value—probably $15.00 a month would be a reasonable

amount for it, this to be paid since the date that possession was refused to the executors, to wit, November 1st, 1910, and distributed as other proceeds of the land.

The regard to the matter of commissions. The position of Mrs. Markey is clearly sustained by the cases cited, the rule being laid down in section 3648 of the Civil Code, and in *Epperson* v. *Jackson,* 83 S. C. 164, 65 S. E. 217, and *Gee* v. *Hicks,* 9 S. C. Eq. (Richardson Equity Cases), page 22, gives the rule as follows:

"The defendant was entitled to commissions unless it was shown that she had failed to make regular annual returns to the ordinary; in such years as she failed to make returns she was entitled to no commissions. On returns regularly made she was entitled to commissions. So, if she had not made a single return she was entitled to commissions for paying over any balance found in her hands and decreed to be paid to the complainant."

The following is a list of the claims that have been proved and allowed, all of which are respectfully submitted along with the testimony, which I herewith hand up with the exhibit. I have allowed the charge for the monument under the authority of *Patterson* v. *Jones et al.,* 99 S. C. 128, 82 S. E. 1008. There is no testimony that the amount is unreasonable, considering the alleged value of his estate, and it being within the authority of the executors to procure a monument, it is to be presumed in the absence of contrary evidence they procured a proper kind of a monument.

It was also agreed by counsel that the taxes shall be shown by an exhibit of the tax receipts, without further proof and a certificate for the town taxes for 1913 was to be filed with the referee, which was never done, and is, therefore, not included in the statement. There was no proof concerning the taxes for 1914.

D. K. Wright, $6:00; E. Sternberger, $115.00; Robert Scarboro, $10.00; Piedmont Mutual Ins. Co., $4.90; Cly-

burn Merc. Co., $15.50; Bennett D. Co., $3.90; A. L. Calhoun, Jr., $17.76; Pee Dee Advocate, $8.50; Southern Loan and Trust Co., $22.50; digging grave, $5.00.

County and State Taxes for 1909, $23.37; 1910, $22.28; 1911, $22.51; 1912, $22.27; 1913, $23.09.

Town of Clio, 1909, $10.50; 1910, $9.50; 1911, $9.00; 1912, $9.00; monument, $154.00; Mrs. Julia Markey, $500.00. Respectfully submitted, W. M. Stevenson. 7-30-15.

The matter came up for trial on exceptions to the foregoing report before Judge I. W. Bowman, and the following order was made by him:

This case comes before me upon exceptions by both plaintiffs and defendant to the report of W. M. Stevenson, Esq., special referee, after argument, it is ordered that all of said exceptions be dismissed and that the report of said referee be approved, affirmed and stand as the order of this Court.

Further, that plaintiffs, as executors ·or the survivor or survivors of them, are hereby instructed, empowered and directed to sell the home place of James S. LeGette, described in the complaint and that out of the proceeds of said sale that the executors pay the costs of this action, including a proper fee to referee and plaintiffs' attorneys, and that then all outstanding claims against the estate of James S. LeGette mentioned in referee's report, including taxes, be paid in full, and that any surplus remaining in the hands of executors shall be distributed among legatees mentioned in the will of J. S. LeGette. First make provision for payment of note due Laura Markey, she, the said Markey, to account for all rents due by her up to time of settlement as fixed by report of the referee, if the attorneys engaged in the case are unable to fix proper fees to be paid to referee, and plaintiff's attorneys as provided in this order, that the fixing of said fees be referred to J. W. LeGrand, Esq. The sale of said lot shall be advertised by executors in the usual manner,

for sale on any convenient first Monday hereafter, for cash: *Provided,* Same may be sold by said executors at private sale by said executors at any time, the consent in writing of a majority of the interested legatees being first obtained by said executors.

Following are the grounds of appeal by the defendants:

1. Because the presiding Judge committed error in not sustaining the exceptions to the report of the referee, all of which are set out above, and are herewith made a part of this exception.

2. Because the presiding Judge committed error in not holding that the plaintiffs were bound by their bid in the sum of six thousand four hundred and 00-100 dollars, and in not holding that they should be required to take the property at this figure and to account for the same.

3. That the presiding Judge committed error in not allowing the defendant, Julia Markey, compensation for services rendered, to wit: Seven hundred and twenty and 00-100 dollars for board, washing, nursing and care during the last illness of James S. LeGette, from the 18th day of December, 1908, to October 8, 1909, in the sum of seventy-five and 00-100 dollars per month, that is seven hundred and twenty dollars; and also in not allowing the claim of Julia Markey for services, board, washing, nursing and care of Mrs. LeGette from December 24, 1908, to December 3, 1909, at one hundred dollars per month, that is one thousand one hundred and thirty and 00-100 dollars.

4. In holding that there was not sufficient testimony to establish a contract for services between the daughter, Julia Markey, and the father, James S. LeGette.

5. For holding that Mrs. Markey was chargeable for rent for the property, it being respectfully submitted that she was a tenant in common with the other beneficiaries under the will; that there was no income from the property, and that a full accounting having been made by her show-

ing that there was no income, the referee and the presiding Judge both committed error in holding that she was chargeable with the rents *eo nomine.*

6. Because the presiding Judge committed error in allowing a fee of ten and 00-100 dollars to Mr. Robert Scarborough, it being respectfully submitted that the executors had already employed Messrs. Livingston and Muller and D. D. McColl, and it was not necessary to pay a fee to the cousin of one of the executors.

7. That the presiding Judge committed error, as did the referee, in allowing fee of one hundred and fifty-four dollars for a monument.

8. That the presiding Judge committed error in not allowing interest on the note for five hundred dollars from one year after the executors had qualified, it being respectfully submitted that Mrs. Markey was illegally and improperly deprived of the use of her money for all this time.

*Mr. J. K. Owens,* for appellants, submits : *Executors are bound by their purchase:* Bail. Eq. 107; 1 Hill Ch. 445; 2 *Ib.* 401; *Ib.* 430, 434; Civil Code, sec. 3687; 9 Rich. Eq. 217; 37 S. C. 123; 44 S. C. 5.   *Julia Markey not chargeable with rental value:* 2 Strob. Eq. 157; 14 S. C. 309; 15 S. C. 368; 42 S. C. 528; 53 S. C. 350; 82 S. C. 256; 90 S. C. 20.   *Compensation for services:* 34 S. C. 255; 80 S. C. 157; 67 S. C. 240; 53 S. C. 382.

*Mr. D. D. McColl, Jr.,* for respondent, cites : *As to alleged contract for services:* 67 S. C. 243; 34 S. C. 257; 80 S. C. 169.   *As to liability for rental value:* 42 S. C. 259; 53 S. C. 350; 81 S. C. 282.

February 26, 1916.

The opinion of the Court was delivered by MR. JUSTICE WATTS.

For the reasons stated by W. M. Stevenson, Esq., special referee herein, concurred in by his Honor, Judge Bowman, it is the judgment of this Court that the judgment of the Circuit Court be affirmed.

Judgment affirmed.